UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Westinghouse Electric Co.,

                Debtor,

Richard Lightsey and Jessica Cook,

                Appellants,

-v-

Westinghouse Electric Co., LLC and Statutory Unsecured Claimholders Committee.

                Appellees.

18-cv-1786 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Appellants Richard Lightsey and Jessica Cook bring this bankruptcy appeal under 28 U.S.C. § 158 seeking review of the Bankruptcy Court's denial of their request for relief from the automatic stay. *In re Westinghouse Elec. Co.*, No. 17-bk-10751 (MEW), Bk. Dkt. No. 2369. For the reasons that follow, the Bankruptcy Court's decision is AFFIRMED.

**I.    Background**

The following facts are taken from the record and are undisputed unless otherwise noted.

On March 29, 2017, Westinghouse and several affiliates filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. Bk. Dkt. No. 1. As relevant here, Westinghouse provides design and engineering services for the construction of new nuclear power plants. Bk. Dkt. No. 4 ¶ 4. Westinghouse attested that its Chapter 11 filing was driven primarily by "unforeseen challenges that significantly delayed and increased the cost of

construction" of two nuclear power plant projects, the Vogtle Project in Georgia and the V.C. Summer Project in North Carolina. *Id.* ¶ 6; Dkt. No. 14 ("Lightsey Br.") at 3. This appeal concerns the V.C. Summer Project, which was commissioned by the South Carolina Electric and Gas Company and South Carolina Public Service Authority (the "V.C. Summer Owners"). Bk. Dkt. No. 5 ¶ 7.

Concurrently with its Chapter 11 filing, Westinghouse informed the Bankruptcy Court that it intended to "explore the continued feasibility of these projects in a manner that [was] cost-neutral and cash-neutral to the Debtors," and that in the interim "[t]he ultimate resolution of the Debtors' involvement in these projects remain[ed] uncertain." Bk. Dkt. No. 4 ¶ 8. Accordingly, Westinghouse sought and received court approval to enter Interim Assessment Agreements with the owners of the projects such that construction on the projects could continue, with the owners paying their ongoing costs. *See* Bk. Dkt. No. 5 ¶¶ 8–9; Bk. Dkt. Nos. 385, 778. As the Bankruptcy Judge put it, "under the interim agreements with the utilities, immediately upon the bankruptcy the utilities made all the decisions about what work to do or not to do." Dkt. No. 14-12, January 24, 2018 Hearing Tr. ("Tr."), at 40:12–14.

On July 31, 2017, the V.C. Summer Owners announced the abandonment of the V.C. Summer Project. *See* Lightsey Br. at 4. In subsequent filings, one of the V.C. Summer Owners explained that they had entered the Interim Assessment Agreements because Westinghouse had agreed to delay rejecting its agreement with the V.C. Summer Owners to allow for the Owners to assess the overall viability of the project. Dkt. No. 14-6 ¶ 9. They then explained that they had abandoned the project because, given Westinghouse's intended rejection, the Owners were unable to justify taking over and completing the V.C. Summer Project at their own cost and risk. *Id.* ¶ 16. Appellants do not necessarily agree that the Interim Assessment Agreements were

entered to delay Westinghouse's ultimate rejection of the agreement, but they do agree that the agreements were entered because of the uncertain status of Westinghouse's involvement in the projects. *See* Lightsey Br. at 4–5; Dkt. No. 16 ("Lightsey Reply Br.") at 3 n.2.

Appellants here are South Carolina residents and utility customers who contend that they paid separate charges on their electric utility bills to the V.C. Summer Owners specifically to pay for a benefit in advance for capital costs associated with the construction of the V.C. Summer Project. Lightsey Br. at 4; Bk. Dkt. No. 1739 at 2–3. After the V.C. Owners announced their abandonment of the V.C. Summer Project, in August 2017, Appellants filed several actions against the V.C. Owners in the Court of Common Pleas of Hampton County, South Carolina alleging that the V.C. Owners were obligated to confer the benefit for which they had paid or refund the charges attributable to that purpose, and alleging a course of significant project mismanagement. Lightsey Br. at 5; Dkt. No. 15 ("Westinghouse Br.") at 6; *see, e.g.*, Bk. Dkt. No. 2165, Ex. A ¶¶ 6–15, 20–21; *id.* Ex. B. ¶¶ 17–26, 71.

Appellants contend that they also have claims against Westinghouse as the recipient of the funds they paid to the V.C. Summer Owners. Lightsey Br. at 4. Accordingly, they sought relief in the bankruptcy proceeding for claims they have identified as unjust enrichment claims or parallel quasi-contract or tort claims such as breach of the duty of good faith and fair dealing. *See* Tr. at 23:24–24:3, 25:7–13.

Before the Bankruptcy Court, Appellants contended that their claims against Westinghouse were post-petition claims and requested relief from the automatic stay in order to pursue those claims in their South Carolina actions. *See* Bk. Dkt. No. 1739 at 4. In the alternative, if the bankruptcy judge concluded that their claims were pre-petition, they sought an enlargement of time to file proof of claim. *Id.* Westinghouse objected to this motion. Bk. Dkt.

No. 2163. On January 24, 2018, the Bankruptcy Court held a hearing on the motion, and on February 1, 2018 that court entered an order denying relief from the automatic stay and denying relief from the bar date without prejudice to renewal upon a proper showing that the claimants were entitled to relief. Dkt. No. 14-13; Bk. Dkt. No. 2369.

Appellants timely filed a notice of appeal. Bk. Dkt. No. 2569.

## II. Jurisdiction and Standard of Review

District courts have appellate jurisdiction over appeals from bankruptcy courts' final judgments, orders, and decrees under 28 U.S.C. § 158(a). A denial of a request for stay relief qualifies as such a final order. *In re Chateaugay Corp.*, 880 F.2d 1509, 1511–12 (2d Cir. 1989). As Appellants acknowledge, denial of a request for an enlargement of time to file a proof of claim does not.

On appeal, the bankruptcy court's legal conclusions are reviewed *de novo* and its findings of fact are reviewed for clear error. *AppliedTheory Corp. v. Halifax Fund., L.P.*, 493 F.3d 82, 85 (2d Cir. 2007).

## III. Discussion

The question before this Court on appeal is whether the bankruptcy court erred in determining that Appellants' claims against Westinghouse were pre-petition claims subject to the automatic stay notwithstanding the fact that the V.C. Summer Project was abandoned after Westinghouse's Chapter 11 petition was filed.[1]

Appellants' claims arise out of both (a) their pre-petition payment of extra utility fees in advance to the V.C. Summer Owners, which fees were allegedly then paid to Westinghouse and

---

[1] Although Appellants also raise the Bankruptcy Court's denial of their alternative request for an enlargement of time to file as an issue on appeal, the Court lacks jurisdiction over that claim and accordingly does not address it. Appellants may re-raise that issue in a future appeal consistent with the Bankruptcy Code.

4

(b) the V.C. Summer Owners' post-petition abandonment of the V.C. Summer Project, which Appellants contend was caused by Westinghouse's post-petition rejection of its contracts with the V.C. Summer Owners.

### A.     Applicable Law

#### 1.     Claims Under the Bankruptcy Code

Section 362(a) of the Bankruptcy Code provides that filing a petition under Chapter 11 operates as an automatic stay of all actions "to recover a claim against the debtor that arose before" its petition was filed. Accordingly, in determining whether a claim is subject to the automatic stay, the court examines whether the claim arose pre- or post-petition.

The Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5)(A). As a general matter, a pre-petition claim is a "(1) right to payment (2) that arose before the filing of the petition." *In re Matter of Motors Liquidation Co.*, 829 F.3d 135, 156 (2d Cir. 2016). Such a claim may also exist when the right to payment is contingent on future events provided that it "result[s] from pre-petition conduct fairly giving rise to that contingent claim." *Id.* at 156 (quoting *In re Chateaugay Corp.*, 944 F.2d 997, 1005 (2d Cir. 1991)). The Second Circuit has emphasized that "Congress unquestionably expected the definition of bankruptcy claims to have wide scope." *Chateaugay*, 944 F.2d at 1003; *Penn. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558 (1990) (noting Congress's intent to give the term "claim" the "broadest possible scope" to ensure that "all legal obligations of the debtor . . . will be dealt with in a bankruptcy case").

In contrast, claims that arise out of a debtor's post-petition operations are not considered pre-petition claims, but "administrative expenses" not subject to the automatic stay. 11 U.S.C.

§ 503(b)(1)(A). Administrative expenses are treated differently by the Bankruptcy Code in order to facilitate the reorganization effort by encouraging third parties who might otherwise be reluctant to transact with a debtor-in-possession. *Amalgamated Ins. Fund v. McFarlin's Inc.*, 789 F.2d 98, 101 (2d Cir. 1986). At the same time, administrative priorities are narrowly construed in order to ensure the debtor's assets are distributed to all creditors equally and consistent with the broader purposes of the Bankruptcy Code. *Id.* at 100.

Typical administrative expenses are so classified because they confer a benefit on the estate, but torts committed by a debtor-in-possession during the course of a Chapter 11 case also qualify. *Reading Co. v. Brown*, 391 U.S. 471, 482 (1968).

### 2. Circuit Guidance on Classifying Claims

Second Circuit case law provides some guidance as to when to classify cases in which some conduct occurred pre-petition and some occurred post-petition as a contingent or unmatured pre-petition claim—or, as asserted here, a post-petition claim.

The Second Circuit recently emphasized that it "has not decided . . . the difficult case of pre-petition conduct that has not yet resulted in detectable injury, much less the extreme case of pre-petition conduct that has not yet resulted in any tortious consequences to a victim." *Matter of Motors*, 829 F.3d at 156 (quotation and internal quotation marks omitted). It noted that there might be serious practical and constitutional problems with extending the definition of claim "to include . . . claimants whom the record indicates were completely unknown and unidentified at the time the debtor filed its petition and whose rights depended entirely on the fortuity of other occurrences." *Id.* (quotation and internal brackets omitted). To moderate this concern, the Second Circuit has required minimum contacts or a relationship making identifiable the individual with whom the claim does or would rest. *Id.* This general logic is consistent with the

6

Circuit's explanation that "the Code's inclusion of 'unmatured' and 'contingent' claims is usually said to refer to obligations that will become due upon the happening of a future event that was within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created." *Chateaugay*, 944 F.2d at 1004.

The Circuit has applied these minimum contact and relationship rules to define claim status. For example, in the *Matter of Motors* litigation, the Circuit concluded that economic loss claims arising from an ignition switch defect in GM cars were pre-petition claims. 829 F.3d at 156–57.[2] The claims flowed from the operation of GM's pre-petition business and involved pre-petition contacts between the claimants and the company, but the defects were revealed five years later. *Id.* The claims were contingent: the ignition switch defect was present, but an individual could not bring suit in court until she was informed that the defect existed. *Id.* In contrast, independent claims based on the reorganized GM's post-closing wrongful conduct, including misrepresentations about the nature of the defect after the petition had been filed, were post-petition claims. *Id.*

But even when the parties had minimum contacts with one another or had a formal relationship, the fact that some of the conduct leading to the claim occurred prior to the petition date is not necessarily sufficient to render it a pre-petition claim. For example, in the *Enron* case, the bankruptcy court determined that a claim arising from a post-petition conversion of property by a debtor constituted a post-petition administrative expense rather than a pre-petition claim notwithstanding the fact that the parties had a pre-petition contract for storage of the property at issue. *In re Enron Corp.*, No. 01-B-16034 (AJG), 2003 WL 1562201, at *8–9

---

[2] Although the legal context in *Matter of Motors* concerned the debtor's attempt to discharge claims by "free and clear" sale order under 11 U.S.C. § 363(b)(1) and (f) rather than the present stay request, the matter also depended upon classifying claims as pre- or post-petition claims under the Bankruptcy Code.

7

(Bankr. S.D.N.Y. Mar. 17, 2003). The bankruptcy court reasoned that the tort claim at issue arose from the debtor's attempt to preserve the estate by continuing to operate its business post-petition. *Id.* at *9. While the contract between the parties was formed prior to the petition, both the product delivery and the alleged conversion occurred afterwards. *Id.* at *10. In reaching this conclusion, the court explicitly noted that it was not reaching the issue of whether pre-petition delivery would have rendered the claim pre-petition. *Id.*

### B. Appellants Raise Pre-Petition Claims

Applying these principles to Appellants' purported unjust enrichment and/or quasi-contract claims against Westinghouse, the Court agrees with the Bankruptcy Court that these are pre-petition claims subject to the automatic stay.

The Bankruptcy Court determined that Appellants' claims were pre-petition because "all of the things that created the obligations and resulted in the charges"—"construction agreements that were entered into pre-petition, cost obligations that were incurred pre-petition, apparently approvals of rate changes that happened pre-petition that were designed to allow the utility to defray the costs"—were "pre-bankruptcy events." Tr. at 51:14–20. When "[t]he monies [Appellants were] seeking to recover were all pre-bankruptcy under a pre-bankruptcy arrangement and a pre-bankruptcy set of circumstances," the fact that the project was abandoned "during bankruptcy [did not] give [Appellants] a post-petition claim." Tr. at 26:4–8. Put differently, "all of the unjust enrichment happened pre-bankruptcy," and Appellants only concluded it was unjust once the project ended post-petition. Tr. at 28:17–20.

Appellants challenge this conclusion, emphasizing that their claims only arose as a result of the post-petition abandonment of the V.C. Summer Project; without that abandonment, they represent that they would have had no reason to assert a claim against Westinghouse for the

8

funds received for construction of the project. Accordingly, they analogize their claims to the conversion claims the *Enron* court deemed post-petition, notwithstanding the fact that they arose out of a pre-petition contract; and the independent causes of action against New GM the *Matter of Motors* court deemed post-petition notwithstanding their connection to faulty ignition switches manufactured pre-petition. Lightsey Br. at 11.

Appellants further argue that their claims must be post-petition because the only conduct *of Westinghouse's* that the Appellants complained of was its post-petition termination of the V.C. Summer Project. *See* Lightsey Reply Br. at 3. Reading the case law to stand for the proposition that "the focus is on when the debtor's conduct occurs," Appellants contend that Westinghouse's post-petition conduct renders their claim a post-petition claim. *Id.* at 4–5.

### 1. Appellants' Contingent Claim Was Within the Presumed Contemplation of the Parties Pre-Petition

The Court finds these arguments unpersuasive for several reasons. As an initial matter, the fact that a party would have no reason to assert a claim until the occurrence of a future event does not mean that the claim is post-petition. It is instead fully consistent with its classification as a contingent claim.

Further, Appellant's focus on the timing of the debtor's conduct is an unconvincing read of precedent. While Appellant may be correct that the examples in the case law can accurately be classified as pre- or post-petition depending upon when the debtor's primary conduct took place, Appellant identifies no authority for its contention that the timing of its conduct is the "focus" in the analysis. To the contrary, as the Second Circuit explained in *Matter of Motors*, the focus is on whether there is sufficient contact or relationship between the debtor and the claimants such that the claimant is identifiable. 829 F.3d at 156. In this case, utility customers were easily identifiable prior to the petition date based upon the separate fees assessed on their

9

utility bills. To use the language of the *Chateaugay* court, the future event of the project's abandonment "was within the actual or presumed contemplation" of the utility customers and the debtor "at the time the original relationship between the parties was created." 944 F.2d at 1004.

Moreover, as the bankruptcy court explained in *Enron*, the logic of permitting post-petition torts to overcome the expansive notion of a claim otherwise applicable in bankruptcy law is to avoid penalizing post-petition dealing with the debtor, particularly when the debtor is attempting to manage its business to protect the interest of its claimants. Here, in contrast, all of the relevant dealings with the debtor occurred prior to the petition date, and there are no allegations that the utility customers relied in any respect on Westinghouse's limited continued operations.

### 2. Westinghouse Engaged in Some Pre-Petition Conduct

Even if the timing of the debtor's conduct were the appropriate emphasis, there are two reasons Appellants' claims should still be classified as pre-petition. First, the debtor did engage in relevant conduct prior to filing its petition—it accepted the funds that Appellants now claim generated an obligation for which it can be held accountable in quasi-contract or as unjust enrichment.

Second, it is far from clear that Westinghouse's conduct relating to abandonment of the V.C. Summer Project was independent from its conduct prior to the petition date. Westinghouse contends that Appellants allege "significant detectable injury prior to the petition date, as well as allegations of longstanding pre-petition misconduct that would fairly give rise to a claim, even if it were a contingent one." Westinghouse Br. at 23. Moreover, although Appellants attribute the ultimate abandonment of the V.C. Summer Project to Westinghouse's post-petition refusal to complete performance of its contract with the V.C. Summer Owners, the document Appellants

10

cite for this factual representation notes that Westinghouse intended to reject the agreement upon filing for bankruptcy. Dkt. No. 14-6 ¶ 6. It agreed to delay rejecting its agreement with the V.C. Summer Owners to permit the Owners sufficient time to understand what would be required to complete the project if they did so at their own cost and risk. *Id.* ¶¶ 6, 8.

The Bankruptcy Court did not explicitly find these facts in its determination below, and the Court here will not engage in appellate fact-finding over what may be contested matters. *See* Lightsey Reply Br. at 3 n.2. But undisputed facts in the bankruptcy record indicate that, at minimum, Westinghouse was uncertain about the continued feasibility of the V.C. Summer Project, and relied on the V.C. Summer Owners to make all payments while that feasibility was being evaluated. These facts illustrate a close relationship between the petition filing and the risk that the project would be abandoned, and suggest that the abandonment of the project was attributable to a course of debtor conduct, not all of which was limited to the post-petition period.

## IV. Conclusion

For the above stated reasons, the order of the Bankruptcy Court is hereby AFFIRMED. The Clerk of Court is respectfully requested to close the above-captioned action.

SO ORDERED.

Dated: March 27, 2019
New York, New York

ALISON J. NATHAN
United States District Judge